**TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 88–4595.

United States Court of Appeals, Fifth Circuit.

Feb. 7, 1990.

Karol Lynn Newman, Newman & Holtzinger, Washington, D.C., for Carnegie Natural Gas Co.

John S. Schmid, J. Richard Tiano, Barbara K. Heffernan, Washington, D.C., for Bay State Gas Company, et al.

James F. Bowe, Jr., Washington, D.C., for Long Island Lighting Co.

Stephen J. Small, William E. Mohler, III, Charleston, W.Va., for Columbia Gas Transmission Corp.

Kevin J. Lipson, John E. Holtzinger, Jr., Washington, D.C., for CNG Transmission Corp.

Richard A. Solomon, David D'Allessandro, Washington, D.C., for The Public Service Com'n of the State of N.Y.

Joseph M. Oliver, Jr., M. Lisanne Crowley, Washington, D.C., for New Jersey Natural Gas Co.

James R. Lacey, Newark, N.J., for Public Service Elec. and Gas Co.

William I. Harkaway, Steven J. Kalish, Washington, D.C., Barbara M. Gunther, Asst. Gen. Counsel, New York City, for Consol. Edison Co.

Kathleen C. Lake, J. Evans Attwell, Henry S. May, Jr., Vinson & Elkins, Judy M. Johnson, Texas Eastern Transmission Corp., Vice President & General Counsel, Houston, Tex., for Texas Eastern Transmission Corp.

Robert H. Solomon, Hanford O'Hara, Jerome Feit, Solicitor, F.E.R.C., Washington, D.C., for F.E.R.C.

Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

*The Short Answer*

The Federal Energy Regulatory Commission (FERC or the Commission) struck

down a provision of several of Texas Eastern Transmission Corporation's (Texas Eastern's) tariff structures known as the "minimum commodity bill." [1] The appeal has been abandoned with respect to all but one of these tariff structures, the Winter Service (WS) rate schedule. To the elemental complaint of Texas Eastern that elimination of the WS schedule will result in its not being repaid for gas earlier purchased and put in storage, the Commission has expressly stated that Texas Eastern can achieve the same benefits it now receives from its WS schedule. In its Denial of Rehearing, the Commission stated that Texas Eastern can avoid any adverse consequences of the elimination of its minimum commodity bills by charging its customers when it purchases gas and injects it for storage rather than when it withdraws that gas from storage for delivery months later. Under the circumstances, with Texas Eastern assured that by appropriate procedures it can attain this objective, and for the reasons expressed, we affirm.

### Summer Gas, Winter Use

Texas Eastern owns and operates an interstate natural gas pipeline which extends over 1,500 miles from producing areas in the south to a termination point near New York City. As such it is subject to § 1(b) of the Natural Gas Act (NGA). 15 U.S.C. § 717(b) (1982). The rates at which interstate pipelines sell gas for resale are subject to regulation under §§ 4 and 5 of the NGA. 15 U.S.C. §§ 717c, 717d (1982).

Natural gas rates include two primary components: a demand charge and a commodity charge. The demand charge is a flat charge based on the customer's entitlement to gas; it is collected without regard to the actual quantity of gas purchased by the customer. The commodity charge is a per unit charge collected for the recovery of specified fixed costs based on units of gas actually sold. A minimum commodity bill requires a customer to pay for all or part of its gas entitlement, whether or not the gas is actually taken.

Only Texas Eastern's WS tariff is at issue on this appeal. Through its WS service, Texas Eastern has attempted to structure a rate schedule that will allow it to supply its customers' peak needs in the winter months. In connection with its WS service contracts, Texas Eastern purchases gas in the summer, injects the gas into storage, and then makes the gas available to its customers during the winter heating season—from November 16 to April 15 of each year. WS customers pay for the gas when it is withdrawn from storage in the winter months. Each of Texas Eastern's WS customers withdraws all of its contract demand level volume by the end of the winter heating season. Brief of Texas Eastern at 5, *citing*, R. 964. Under this system, Texas Eastern commits to its customers both by buying gas and incurring fixed costs (including storage costs) months before the gas is delivered. The WS Rate Schedule includes a 100% minimum commodity bill.

Since 1985, Texas Eastern has used a "modified fixed variable" (MFV) method of cost classification, allocation, and rate design. In an MFV structure, fixed costs are included in the demand component of the rate and recovered irrespective of customers' takes of gas, except production function costs, return on equity, and related income taxes, which are included in the commodity component. *See* Affirmance, 43 F.E.R.C. ¶ 61,076, at p. ——. The Commission required Texas Eastern to adopt the MFV method with the minimum commodity bills as a component. *See Texas Eastern Transmission Corp.*, 30 F.E.R.C. (CCH) ¶ 61,144 (Feb. 13, 1985), *reh'g and clarification granted in part, denied in part*, 32 F.E.R.C. (CCH) ¶ 61,056 (July 12, 1985).

### The Controversy

The present controversy began on July 31, 1985 when Texas Eastern filed revised

---

**1.** The Presiding Administrative Law Judge's decision is at 38 F.E.R.C. (CCH) ¶ 63,034 (Mar. 6, 1987) (Initial Decision). This was affirmed by the Commission at 43 F.E.R.C. (CCH) ¶ 61,076 (Apr. 19, 1988) (Affirmance), *reh'g denied*, 43 F.E.R.C. (CCH) ¶ 61,484 (June 20, 1988) (Denial of Rehearing).

tariff sheets seeking a rate change pursuant to § 4 of the NGA. On August 30, 1985, the Commission accepted the filings and suspended the rates to become effective September 1, 1985, subject to refund. *Texas Eastern Transmission Corp.*, 32 F.E.R.C. (CCH) ¶ 61,315 (Aug. 30, 1985).

Other Texas Eastern proceedings were consolidated with this one and settlement discussions began among Texas Eastern, FERC, Intervenors and Interested State Commissions. The issues included: cost of service, cost allocation, rate design, minimum bill provisions, and terms under which Texas Eastern could provide open-access transportation.

The minimum commodity bill issue was severed and submitted to the ALJ. It was agreed that the result of the hearing would have prospective effect only after a Commission order became final and no longer subject to rehearing. Hearings were held on March 4–7, 1986. Texas Eastern and Algonquin Gas Transmission Company supported Texas Eastern's position that the minimum commodity bills should be continued in three of Texas Eastern's rate schedules, including WS.[2] Brooklyn Union Gas Company supported a modification of the minimum commodity bill. The Commission and Columbia Gas Transmission Company, an intervener on appeal as well, urged complete elimination of Texas Eastern's minimum commodity bills.[3]

Texas Eastern argues that its WS rate structure is sound and is needed to ensure its recovery of its actual costs incurred in earlier purchasing and storing of gas.

In recent years, the Commission has devoted a great deal of attention to the issue of minimum commodity bills in various rate structures. Its response has been consistent. In every case we have located where there were both minimum commodity bills and an MFV methodology, the minimum bills have been eliminated from the rate structure because they were "unjust, unreasonable, and unduly discriminatory."

The Commission's first step in this direction came with the issuance of Order No. 380.[4] In it, the Commission held that "all minimum commodity bill provisions that . . . operate to recover variable costs and all provisions that . . . compel a customer to take and pay for a specified minimum volume of gas are unlawful because they permit pipelines to charge customers for costs not actually incurred and restrain, without adequate justification, competition among pipelines by forcing the customers of one pipeline to buy gas from it when less costly gas is available from other pipelines. Accordingly, [FERC] ruled that all existing rate schedules and tariffs shall be inoperative to the extent they provide for a minimum commodity bill that recovers variable costs or require a customer to physically take a minimum amount of gas."

*Transwestern Pipeline Co.*, Opinion No. 238, 32 F.E.R.C. (CCH) ¶ 61,009, at p. —— (July 1, 1985). Order No. 380 and its rationale were approved by the D.C. Circuit in

**2.** The issues involving the other two rate schedules which were initially subjects of this appeal, have been resolved. Texas Eastern's motion to partially withdraw its appeal with respect to the minimum bills found in the DCQ and ACQ Rate Schedules was granted by the court. The propriety of the Commission's decision eliminating the minimum commodity bill in the WS rate schedule is thus the only issue remaining on appeal. For the sake of clarity, references to the DCQ and ACQ Rate Schedules will be omitted in the remainder of this opinion.

**3.** Columbia Gas Transmission specifically declined to take any position regarding the minimum commodity bill in Texas Eastern's WS Rate Schedule. Columbia's Brief at 1, n. 1. Thus Columbia's intervention is irrelevant to the sole issue remaining for resolution on appeal.

**4.** Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Commodity Bills, Order No. 380, 49 Fed.Reg. 22,778 (June 1, 1984), FERC Statutes and Regulations, Regulations Preambles 1982–85, ¶ 30,571; Order No. 380-A, FERC Statutes and Regulations, Regulations Preambles 1982–85, ¶ 30,584; Order No. 380-B, 29 F.E.R.C. (CCH) ¶ 61,076 (1984); Order No. 380-C, 29 F.E.R.C. (CCH) ¶ 61,077 (1984), FERC Statutes and Regulations, Regulations Preambles 1982–85, ¶ 30,607; Order No. 380-D, 29 F.E.R.C. (CCH) ¶ 61,332 (1984); Order No. 380-E, 35 F.E.R.C. (CCH) ¶ 61,384 (1986); *see, Wisconsin Gas Co. v. FERC*, 770 F.2d 1144 (D.C. Cir.1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986) (affirming Orders No. 380, 380-A—D).

*Wisconsin Gas Co. v. F.E.R.C.*, 770 F.2d 1144 (D.C.Cir.1985), *cert. denied*, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986).

The Commission went on to expand that initial position through case-by-case decisions. Through a long line of cases, the Commission, approved by the Circuits, has determined minimum commodity bills to be unfair and unreasonable, inherently anticompetitive, inconsistent with the purposes and structure of the MFV rate design, and unsalvageable by the *Atlantic Seaboard* factors when the MFV design is used. *See, e.g., Transwestern Pipeline Company,* Opinion No. 238, 32 F.E.R.C. (CCH) ¶ 61,009 (July 1, 1985), *reh'g denied,* Opinion No. 238–A, 36 F.E.R.C. (CCH) ¶ 61,175 (August 4, 1986), *aff'd, Transwestern Pipeline Co. v. F.E.R.C.,* 820 F.2d 733 (5th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988); *Tennessee Gas Pipeline Co.,* Opinion No. 249, 36 F.E.R.C. ¶ 61,071 (July 22, 1986), *reh'g denied,* Opinion No. 249–A, 40 F.E.R.C. (CCH) ¶ 61,140 (1987), *aff'd, Tennessee Gas Pipeline Co. v. F.E.R.C.,* 871 F.2d 1099 (D.C. Cir.1989); *ANR Pipeline Company,* Opinion No. 258, 37 F.E.R.C. (CCH) ¶ 61,263 (Dec. 19, 1986), *reh'g denied,* Opinion No. 258–A, 38 F.E.R.C. (CCH) ¶ 61,221 (1987); *Transcontinental Gas Pipe Line Corp.,* Order No. 260, 37 F.E.R.C. ¶ 61,328 (Dec. 30, 1986), *reh'g denied in pertinent part,* Opinion No. 260–A, 40 F.E.R.C. (CCH) ¶ 61,188 (1987); *East Tennessee Natural Gas Co. v. F.E.R.C.,* 863 F.2d 932 (D.C.Cir. 1988); *Panhandle Eastern Pipe Line Co. v. F.E.R.C.,* 881 F.2d 1101 (D.C.Cir.1989).

■ In light of this authority, we affirm the Commission's decision to eliminate Texas Eastern's minimum commodity bill.

### *Texas Eastern's Right to Recover Cost of Gas and Storage Explicitly Recognized*

■ The Commission dealt extensively with Texas Eastern's contentions and suggested a ready means of resolution.

5. The burden of proof was on the opponents of the minimum bills to establish that they are unjust, unreasonable or unduly discriminatory. The proponent, Texas Eastern, then had the burden of coming forward with evidence establishing justification. Initial Decision, 38 F.E.

Texas Eastern's statement that it will be forced to restructure this service if the minimum bill is eliminated is not persuasive. As described, Texas Eastern's "need" for this minimum bill arises because of a lag in billing. The service is currently structured so that the WS customers are not billed for the gas until it is withdrawn from storage. *The remedy for the adverse consequences that Texas Eastern cite is to restructure the service so that the customers purchase and pay for the gas when it is injected, not when it is withdrawn.*

Denial of Rehearing, 43 F.E.R.C. ¶ 61,484, at p. —— (Emphasis added). We affirm this as well.

### *Administrative Proceedings*

Although perhaps pretentiously overdone, the following detailed summary of FERC's review of the minimum commodity issue in Texas Eastern's WS Rate Schedule illustrates the exhaustive consideration given by the Commission, which simplifies and abbreviates our review.

On March 6, 1987, the ALJ issued his initial decision finding the minimum commodity bills unlawful and directing their removal from all of Texas Eastern's rate structures, including WS. 38 F.E.R.C. (CCH) ¶ 63,034 (Mar. 6, 1987), *aff'd,* 43 F.E.R.C. (CCH) ¶ 61,076 (Apr. 19, 1988), *reh'g denied,* 43 F.E.R.C. (CCH) ¶ 61,484 (June 20, 1988). The ALJ found that those advocating a change in Texas Eastern's tariffs had met their initial burden of showing Texas Eastern's minimum commodity bills were unjust, unreasonable and unduly discriminatory. Texas Eastern failed to show that the minimum commodity bills were just and reasonable. Initial Decision, 38 F.E.R.C. ¶ 63,034, at p. ——.[5]

The ALJ made several subsidiary findings of fact and conclusions of law to reach this ultimate result.

R.C. ¶ 63,034, at p. ——, *citing, Transwestern Pipeline Co.,* Order No. 238–A, 36 F.E.R.C. ¶ 61,175, at p. 61,433, *aff'd,* 820 F.2d 733 (5th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988).

(i) Under Texas Eastern's MFV rate design, the only fixed costs in the commodity component of the rate are 100% of the return on equity and related income taxes and 100% of production costs. All other fixed costs are placed in the demand component where their recovery is assured regardless of sales volume. The ALJ found that Texas Eastern should be required to bear the risk of its full profit. Equity return should only occur when Texas Eastern sells or transports gas. The ALJ further found that this issue was not brought to the Commission's attention when it approved the MFV methodology with the minimum commodity bills in place and was therefore not ruled on previously. Initial Decision, 38 F.E. R.C. ¶ 63,034, at p. ——.

(ii) The ALJ found that Texas Eastern's minimum commodity bills would guarantee its recovery of the largest portion of return on equity and associated taxes irrespective of the company's performance, sales and throughput. This is one of the primary reasons why minimum commodity bills have been held unjust, unreasonable and unlawful in four recent cases.[6] In these cases, the Commission determined that the minimum commodity bills restrained competition, undermined the basis for the MFV rate design by guaranteeing much of the return on equity which should be at risk to the pipeline, and were not justified under *Atlantic Seaboard Corp. v. Federal Power Commission*, 38 F.P.C. 91 (1967), *aff'd*, 404 F.2d 1268 (D.C.Cir.1968) (*see infra*).

(iii) The ALJ found that the minimum commodity bill would have an adverse effect on competition, and particularly on Texas Eastern's customers and their consumers. By guaranteeing Texas Eastern's profits, the minimum bills will reduce Texas Eastern's incentive to be efficient, reduce costs, sell more gas, and compete more vigorously. They also are a barrier to competition from other pipelines and suppliers who must overcome the minimum bill "penalty" to Texas Eastern's customers. The ALJ found it undisputed that Texas Eastern was the lowest cost supplier, but held that the adverse effects on potential competition were sufficient given increasing deregulation and FERC's unmistakable intent to vigorously promote competition in the increasingly free market. The current price spread indicated Texas Eastern did not need its minimum bills to compete effectively.

(iv) The ALJ additionally found the WS minimum commodity bill unlawful because it collects gas costs and other variable costs in addition to fixed costs. Commission Order No. 380 ordered the elimination of all minimum take provisions and all variable costs, including gas costs, from all pipeline minimum bills. It left for case-by-case decision the question of minimum bills to recover fixed costs. *See supra* note 4. Texas Eastern argued that since it actually incurs the gas costs involved in providing WS service, it is not bound by Order No. 380 which prohibited companies from collecting gas costs that were not incurred. The ALJ rejected that argument on the basis of *Wisconsin Gas Co. v. F.E.R.C.*, 770 F.2d 1144 (D.C. Cir.1985), cert. *denied*, 476 U.S. 1114, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986), where, while upholding Order No. 380, the D.C. Circuit held that its prohibitions apply to situations where the pipeline actually had incurred the costs it seeks to cover. *Id.* at 1158, n. 18.

(v) The ALJ held that Texas Eastern's storage capacity was not limited exclusively to WS gas. Also, nothing in the record indicated that WS obligations could not be met by flowing gas. Thus, he found

**6.** *Transwestern Pipeline Co.*, Opinion No. 238, 32 F.E.R.C. (CCH) ¶ 61,009 (1985), *reh'g denied*, Opinion No. 238–A, 36 F.E.R.C. (CCH) ¶ 61,175 (1986), *aff'd*, 820 F.2d 733 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988); *Tennessee Gas Pipeline Co.*, Opinion No. 249, 36 F.E.R.C. (CCH) ¶ 61,071 (1986), *reh'g denied*, Opinion No. 249–A, 40 F.E.R.C. (CCH) ¶ 61,140 (1987), *aff'd in pertinent part*, 871 F.2d 1099 (D.C.Cir.1989); *ANR Pipeline Co.*, Opinion No. 258, 37 F.E.R.C. (CCH) ¶ 61,263 (1986), *reh'g denied*, Opinion No. 258–A, 38 F.E.R.C. (CCH) ¶ 61,221 (1987); *Transcontinental Gas Pipeline Corp.*, Opinion No. 260, 37 F.E.R.C. (CCH) ¶ 61,328 (1986), *reh'g denied in pertinent part*, Opinion No. 260–A, 40 F.E.R.C. (CCH) ¶ 61,188 (1987), *aff'd*, *Public Service Co. of N.C. v. F.E. R.C.*, 851 F.2d 1548 (5th Cir.1988).

nothing unique about the WS schedule to warrant a minimum bill.

(vi) The ALJ found that, for the above reasons, the opponents of the minimum commodity bill met their burden of showing the bills to be unjust and unreasonable. In light of this showing, Texas Eastern had the burden of establishing justification, which it failed to do.[7] According to the ALJ, Texas Eastern did not establish any of the three justifications set out in *Atlantic Seaboard,* 38 F.P.C. at 95, which might have saved its minimum bills.[8]

(a) The four recent cases, cited *supra* at note 6, indicate that Texas Eastern's minimum commodity bills cannot be justified as protection for recovery of commodity fixed costs. Under the MFV rate structure, the only fixed costs thus protected are return on equity and related tax, and production costs. These costs must be fully at risk to promote efficiency and competition.

(b) Texas Eastern did not establish that there would be a substantial shift of costs from its current minimum bill customers to its full requirements customers as the Commission has defined "substantial." The ALJ cited Opinion No. 258, 37 F.E.R.C. (CCH) ¶ 61,263, at p. 61,750 (1986) and Opinion No. 238-A, 36 F.E.R.C. (CCH) ¶ 61,175, at p. 61,445 (1986), where larger projected cost shiftings than would occur here were held to be "modest"—i.e. not "substantial." The ALJ held that given the Commission's current priorities, "the benefits of competition that would be provided through elimination of the fixed cost minimum bill outweigh the detriments to full requirements customers ... who may be affected by cost shifting." Initial Decision, 38 F.E.R.C. ¶ 63,034, at p. ——.

(c) There is no nexus between Texas Eastern's minimum bills and any of its take-or-pay obligations. The Commission has previously rejected the argument that minimum bills are needed to prevent customers from "swinging off" and putting the pipeline's take-or-pay obligations at risk because it is anticompetitive. Initial Decision, 38 F.E.R.C. ¶ 63,034, at p. ——, *citing,* Order No. 380 Series, FERC Statutes and Regulations, Regulations Preambles 1982–85, ¶ 30,571, at p. 30,970.

(vii) Based on all of the foregoing, the ALJ ordered that "Texas Eastern shall file new tariff sheets eliminating the minimum commodity bills from its existing rate schedule[ ] ... WS." Initial Decision, 38 F.E.R.C. ¶ 63,034, at p. ——.

Texas Eastern took exceptions to the ALJ's decision to eliminate the minimum commodity bills. The Commission affirmed the ALJ's initial decision and denied rehearing. It is from these two opinions of the Commission that Texas Eastern appeals. Texas Eastern's challenge to the ALJ's decision was multifaceted. Because this appeal seeks review of the Commission's determination of most of these challenges, we will summarize the Commission's holdings.

FERC upheld the ALJ's decision that minimum commodity bills are inconsistent with the MFV methodology. The purpose of the MFV methodology is to tie the pipeline's recovery of its return on equity to its sales performance and throughput levels. The Commission found Texas Eastern's rate structure to be inconsistent with this theory in that only 1.93% of Texas Eastern's return on equity was at risk.

Texas Eastern also claimed that the major rationale for use of MFV methodology was promotion of competition and that since it had minimum bills in place when the methodology was prescribed on its sys-

---

7. *See supra* note 5.

8. These tests are: "(1) protecting the pipeline against the risk of not recovering the fixed costs in the commodity component; (2) protecting full requirements customers from bearing a disproportionate share of the fixed costs resulting from swings off the system by partial requirements customers; and (3) protecting customers from take-or-pay liabilities that the pipeline might otherwise incur." Affirmance, 43 F.E.R.C. ¶ 61,076, at p. ——, n. 20.

tem, the doctrine of *res judicata* would bar a holding that the minimum bills are anticompetitive. No changed circumstances were shown that would lift the bar of *res judicata.* Interveners on Texas Eastern's behalf also argued that it was improper for the ALJ to rely on prior cases to determine that use of the MFV methodology precludes retention of the minimum commodity bills.

The Commission held that it was proper for the ALJ to apply reasoning used in prior cases where the issue was scrutinized on a case-by-case basis. Also, there is nothing to prevent the Commission from establishing a presumption against particular rate methods in conjunction with particular tariff provisions. *See Kansas Gas & Electric Co. v. F.E.R.C.,* 758 F.2d 713 (D.C. Cir.1985). The Commission expressly left open in the Opinion No. 380 series, the possibility that it would, in future, apply presumptions to cases involving fixed cost minimum bills or even eliminate *all* minimum bills.[9]

Order No. 380 predated the implementation of the MFV methodology on many pipelines. The Commission held that its determination that the MFV methodology is inconsistent with minimum commodity bills, was fully applicable to Texas Eastern.

■ Likewise, Texas Eastern's *res judicata* argument failed. The issue of whether minimum commodity bills are inconsistent with the MFV methodology was not before the Commission at the time it approved Texas Eastern's use of the MFV methodology. The reasonableness of Texas Eastern's minimum bills was not then even addressed by the Commission. In addition, the doctrine of *res judicata* is simply not applicable to Commission rate proceedings. FERC has a continuing obligation to ensure that pipeline rates are just and reasonable pursuant to §§ 4 and 5 of the NGA. The fact that a rate was once found reasonable does not preclude a finding of unreasonableness in a subsequent proceeding. Here Texas Eastern has had the opportunity to fully litigate the issue. It provided evidence, as did the Interveners who supported its position that the minimum bills were reasonable. Texas Eastern did not prevail on this issue, but it was not denied the opportunity to litigate it.

The Commission also upheld the ALJ's finding that Texas Eastern's minimum bills were anticompetitive. The Commission's reasons were legion. (i) Minimum bills increase the cost of alternative gas supplies and prevent the purchase of lower priced gas if the price spread is less than the amount of the minimum bill. (ii) Gas supplies are on the market for both long-term and spot purchases at prices lower than Texas Eastern's. (iii) Minimum bills have substantially increased the gas costs of customers and the consumers they serve. (iv) Some of Texas Eastern's competitors have had the minimum bills removed from their rate structures;[10] allowing Texas Eastern to retain its minimum bills would give it an unfair advantage over those competitors. (v) The probable consequence of traditional fixed cost minimum bills in today's market is an unreasonable restraint on trade because supplies exceed demand. In such a situation, a minimum bill by its nature forecloses competition making it uneconomic for customers to purchase gas on a least cost basis. *See Transcontinental Gas Pipe Line Corp.,* 40 F.E.R.C. (CCH) ¶ 61,188 (1987) (denial of rehearing in pertinent part), at p. ——.

---

9. "The Commission has considered the arguments made on both sides of this issue and does not rule out the possibility of such a rule in the future. For the present, however, the Commission believes it would be best to take only the steps proposed in the Notice. Accordingly, the Commission intends to assess the impact of removal of variable costs from minimum commodity bills before it takes any further generic steps on this subject." Affirmance, 43 F.E.R.C. ¶ 61,076, at p. ——, *citing,* Order No. 380, at p. 30,974.

10. *See, e.g., Tennessee Gas Pipeline Co.,* Opinion No. 249, 36 F.E.R.C. (CCH) ¶ 61,071 (1986), *reh'g denied,* Opinion No. 249–A, 40 F.E.R.C. (CCH) ¶ 61,140 (1987), *aff'd in pertinent part,* 871 F.2d 1099 (D.C.Cir.1989); *Transcontinental Gas Pipe Line Corp.,* Opinion No. 260, 37 F.E.R.C. (CCH) ¶ 61,328 (1986), *reh'g denied in pertinent part,* Opinion No. 260–A, 40 F.E.R.C. (CCH) ¶ 61,188 (1987).

In the Commission's view, Texas Eastern's evidence failed to overcome this showing. The current price spread merely demonstrated that Texas Eastern did not need its minimum bills to compete effectively. The fact that Texas Eastern was currently the lowest cost supplier was not determinative. Finally, it would be purely speculative to believe that producers would be less willing to enter into contracts with Texas Eastern if it didn't have minimum commodity bills. Thus, on the issue of anticompetitiveness, the Commission upheld the ALJ.

The Commission also upheld the ALJ's determination that Texas Eastern failed to establish any of the *Atlantic Seaboard* justifications [11] for its minimum bills. (1) Texas Eastern did not prove the minimum bills were needed to ensure fixed cost recovery. With the minimum bills in place, only 1.93% of Texas Eastern's equity return was at risk; that level was unacceptably low. In addition, the fact that Texas Eastern was the lowest cost supplier meant that it would earn or exceed its allowed return on equity without the minimum bills if its sales and throughput remained equal to or above the level that its rates are based on. (2) Texas Eastern did not show the minimum bills were required to prevent substantial cost shifting from partial to full requirements customers. Opinion 260–A [12] held that this was not a sufficient justification when a pipeline is using the MFV methodology. Additionally, the maximum shift due to swing-offs of partial requirements customers would not be substantial. The effect has been mitigated by the bifurcated structure of the MFV rate design. (3) There was no nexus between take-or-pay liability and carrying costs here to justify the minimum bills.

The Commission's opinion on rehearing was issued on June 20, 1988. It held that most of the grounds on which rehearing was sought were not new and were addressed by the earlier April 19, 1988 Order.[13] The Commission did address Texas Eastern's contention that in its affirmance it had not considered evidence concerning the unique characteristics of the WS service and failed to discuss the elimination of the WS minimum bill separately. Texas Eastern argued on rehearing that the costs for this gas are all pre-incurred since Texas Eastern purchases the gas in the summer for withdrawal by its customers in the winter. The customers are billed when it is withdrawn from storage. Because of this structure, Texas Eastern argued that its WS minimum bills should be an exception to Order No. 380. All of the costs billed under the WS structure are actually incurred, thus Texas Eastern gets no windfall from its minimum bills under this schedule. Further, elimination of the minimum bills here would require an entire restructuring of the WS schedule.

The Commission adopted the position advanced by the ALJ that there was nothing unique about the WS service to justify retention of the minimum bills. The storage was not exclusively dedicated to WS gas and variable, as well as fixed costs, were recovered. Finally, the Commission stated its position, which we consider critical, that Texas Eastern's "remedy for the adverse consequences that [it] cite[s] is to restructure the service so that the customers purchase and pay for the gas when it is injected, not when it is withdrawn." Denial of Rehearing, 43 F.E.R.C. ¶ 61,484, at p. ——.

### A Presumption of Validity

The Commission's duties are spelled out by sections 4 and 5 of the NGA. The rates

11. *See supra* note 8.

12. *Transcontinental Gas Pipe Line Corp.*, 40 F.E.R.C. ¶ 61,188 (denial of rehearing in pertinent part), *see supra.*

13. Texas Eastern sought rehearing on the grounds that
the Commission erroneously eliminated its minimum bills because it (1) improperly analyzed the relationship between the minimum bills and the adoption of the ... MFV method

of cost classification, allocation and rate design on the Texas Eastern system; (2) incorrectly found that the minimum bills adversely affect competition and result in undue discrimination; (3) incorrectly analyzed the record evidence supporting the need for the minimum bills in light of the *Atlantic Seaboard* tests; and (4) misapplied the burden of proof and applied inapplicable presumptions. Denial of Rehearing, 43 F.E.R.C. ¶ 61,484, at p. ——. (Footnotes omitted.)

charged by natural gas companies "shall be just and reasonable, and any such rate or charge that is not just and reasonable is declared to be unlawful." NGA § 4(a), 15 U.S.C. § 717c(a). Section 5(a) imposes on the Commission the authority and responsibility to review rates to see if they are in compliance with the NGA.

(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint ... shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in full force, and shall fix the same by order ...

15 U.S.C. § 717d(a) (1982).

In our review of FERC Orders under § 19(b) of the NGA, the Commission's factual findings, "if supported by substantial evidence, shall be conclusive." 15 U.S.C. § 717r(b) (1982); see *Transwestern Pipeline Co. v. FERC*, 820 F.2d 733, 738 (5th Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 696, 98 L.Ed.2d 648 (1988). *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312, 336 (1968) was a sharp reminder that Congress left the regulation of the natural gas industry to the Commission's informed judgment and not to the preferences of reviewing courts. Thus, "[a] presumption of validity ... attaches to each exercise of the Commission's expertise...." The Fifth Circuit reviews Commission action on the basis of "(1) whether the Commission abused or exceeded its authority, (2) whether the essential elements chosen by the Commission for its order are supported by substantial evidence, and (3) whether the 'end result' is unjust and unreasonable." *Transwestern*, 820 F.2d at 738–39 (citations omitted).

The D.C. Circuit outlined the procedure for dealing with minimum commodity bill cases:

This court, in *East Tennessee*, ... acknowledged that FERC retains the ultimate burden of proving an existing minimum bill unlawful; we held, however, that the Commission could (1) reasonably conclude that minimum bills are anticompetitive and therefore *prima facie* unlawful, and accordingly (2) shift to the pipeline the burden of producing evidence that the minimum bill at issue meets at least one of the three remedial justifications set out in *Atlantic Seaboard* .... A particular bill may be justified if "specifically designed to achieve [one of the stated remedial ends], but nothing more. *Mississippi River Transmission Co. v. F.E.R.C.*, 759 F.2d 945, 950 (D.C.Cir.1985).

*Panhandle Eastern Pipe Line Co. v. F.E. R.C.*, 881 F.2d 1101, 1113 (D.C.Cir.1989).

### Texas Eastern's Remedy

Deterring for a moment analysis of Texas Eastern's contentions, we agree with the Commission that Texas Eastern's remedy is to appropriately restructure its WS Rate Schedule so that costs are collected at the time gas is injected into storage rather than when it is withdrawn for delivery to purchasers. We assume such measures will include the costs incurred or to be incurred by Texas Eastern in or out of storage from the time of injection until the time of withdrawal and the delivery of the gas. In this way, Texas Eastern is protected from the risks imposed by the time lag while complying with the numerous Commission decisions invalidating minimum bills.

■ Texas Eastern's contentions on this appeal can be disposed of quickly. Texas Eastern argues that FERC's elimination of the WS minimum commodity bills shows a lack of understanding of the nature of the service. FERC has demonstrated its familiarity with the specifics of the WS schedule in both the Initial Decision and the Affirmance. It clearly understood how the ser-

vice operated and how the tariff was structured. Moreover, the ALJ's finding that there was nothing unique about the WS schedule which justified retention of the minimum bill there was affirmed by the Commission. Based on this record and the Commission's extended considerations, we do not find the Commission's action arbitrary or capricious, an abuse of discretion, or unsupported by substantial evidence.

The Commission adequately disposed of Texas Eastern's contention that it improperly shifted the burden of proof by requiring it to justify the minimum bill provision. Likewise, *Transwestern* sets out the appropriate standards. Even if *Transwestern* should not be applied because that decision was handed down after the hearing in this case, the opponents met their burden of showing the minimum bill to be anticompetitive.

The asserted error of the ALJ in applying the *Transcontinental* presumption that "a traditional fixed cost minimum commodity bill usually restrains competition and is presumptively unjust and unreasonable" disappears by the Commission spelling out in detail that Order No. 380 expressly left open the possibility that presumptions might arise with respect to fixed cost minimum commodity bills.

Finding that in a situation of MFV rate design none of the *Atlantic Seaboard* factors justified Texas Eastern's WS minimum bills was not an abuse of discretion. Any potential cost shift from partial to full requirements customers has been demonstrated to be modest and outweighed by the benefits to competition that will result from elimination of the minimum bills. Finally, there is no substantial evidence of a nexus between the minimum bills and Texas Eastern's take-or-pay obligations.

The Commission has specifically stated that Texas Eastern by appropriate means may ensure its payment for the fixed costs it incurs. Pipeline purchasers may be charged when the gas is injected into storage rather than when it is withdrawn:

> The remedy for the adverse consequences that Texas Eastern cite is to restructure the service so that the customers purchase and pay for the gas when it is injected, not when it is withdrawn.

Denial of Rehearing, 43 F.E.R.C. ¶ 61,484, at p. ——. We assume this will include costs incident to input and output and storage. If some character of a proceeding or hearing is required to effectuate these assurances of the Commission, we are confident the Commission will readily attend them.

AFFIRMED.